BRENNAN, J.
¶1 Shari Vander Galien, who was employed as a correctional sergeant by the Department of Corrections (DOC) until April 17, 2015, appeals an order that affirmed a decision by the Wisconsin Employment Relations Commission (WERC) denying Vander Galien's claim for additional hazardous duty pay for periods of time after she returned to work from a December 2011 work injury. Following the injury, which resulted when a prisoner collided with her while coming around a corner, DOC paid Vander Galien hazardous duty pay for about three months, ending April 4, 2012.[1] After a doctor cleared her to return to work without restrictions, Vander Galien requested hazardous duty pay for: (1) 271.25 hours used for medical appointments and absences from work between April 4, 2012, and November 15, 2014; and (2) daily absences for a five-month period beginning November 17, 2014, when she notified DOC that she could no longer work at all and stopped reporting to work.[2] DOC denied the hazardous duty pay she sought for those absences.
¶2 Vander Galien appealed and WERC rejected her appeal and dismissed her claim. WERC concluded that she was ineligible for hazardous duty pay for any of the requested time.
¶3 Vander Galien had argued that she was entitled to the benefit for the 271.25 hours because the injury was a cause of the appointments and absences from work, but WERC made a factual finding that "[t]he medical appointments and absences were not directly related to the work injury" she suffered. She had argued that she was entitled to the benefit for the five months beginning November 17, 2014, because the injury made her unable to perform her duties, but WERC made a factual finding that she was "physically able to perform the duties of correctional sergeant from November of 2014 through her termination of employment in April of 2015." Pursuant to WIS. STAT. § 227.52(7), she sought judicial review of the decision, and the trial court affirmed.
¶4 Vander Galien has the burden of showing that the factual findings on which the agency's conclusions are based are not supported by substantial evidence in the record or that the agency erroneously interpreted a provision of law. See WIS. STAT. § 227.57(5) and (6). She has not satisfied that burden. We therefore affirm because we find no ground for setting aside the agency's action under any of the provisions of WIS. STAT. ch. 227. See § 227.57(2).
BACKGROUND
The 2011 application for WIS. STAT. § 230.36 benefits.
¶5 On the morning of December 16, 2011, Vander Galien was in the prison kitchen area, speaking to a colleague, when an inmate who worked in the serving area rounded a corner and collided with her. The parties stipulated that the injury occurred "as the result of an act of an inmate colliding with Vander Galien while they both were walking." WERC's decision notes that "she remained at work on the day in question and completed her shift." The parties stipulated, however, that Vander Galien was "unable to physically perform the duties of her position and was placed on a leave of absence" for the eleven days following the incident.
¶6 A colleague who witnessed the incident from ten feet away told an investigating officer in a January interview that Vander Galien was not knocked down, that the collision caused Vander Galien's radio's microphone to fall off of her uniform, and that she had then asked the inmate "if he was okay." When asked if the inmate was moving at a normal rate of speed when he collided with her, the witness replied that the inmate "was moving fast but [Vander Galien] had her stuff and was moving along too." He also stated that the inmate was permitted to be in the area at the time.
¶7 A second colleague who was four feet away when the incident happened told the investigator that he had been talking to Vander Galien just before the collision, that she had been looking at him, had just said "see ya," and then "just as she turned, they collided." He also recalled that she had asked if the inmate was okay and that at the time of the collision, both Vander Galien and the inmate "were both moving at a brisk pace." He recalled that the inmate, who he said was authorized to be in the kitchen area, "kind of stepped back and looked at [Vander Galien] as if to say why did you run into me."
¶8 In Vander Galien's December 30, 2011 interview about the incident, she said she was not walking but had stopped to speak to another guard. She said, that she "didn't fall but there was immediate pain" and that she did not remember much "because it was so forceful like a wall stun." She described it as "like getting hit by a football player." When asked if she called for assistance, she replied that two colleagues "were right there" and that one of them "asked if I was okay." She said that the inmate had no reason to be in the area and that she believed the collision was "retaliation" for a conduct report the inmate had received five months earlier. In the incident report Vander Galien submitted on December 16, 2011, she described the collision as follows:
As I was walking towards the front of the servery I turned my head to the left to say hi to [Correctional Officer] D. Knollenberg. I suddenly felt a sharp pain to my lower neck and lower back area, this was a result of [an inmate] walking right into me. [The inmate] walked into me so hard dislodging my radio. It is my belief that [the inmate] had ample time to stop his progress and not run in to me.
¶9 On December 20, 2011, Vander Galien submitted an application for hazardous duty pay related to the December 16 incident, and DOC ultimately found Vander Galien was eligible from the date of the injury through April 4, 2012.
¶10 Thereafter, Vander Galien continued working as a correctional sergeant from April 2012 through November 2014. She sought medical treatment for a neck and back condition and for recurring anxiety. Over that period she was treated for those conditions by a chiropractor, physical therapist, physiatrist, psychologist, and psychiatrist.
The 2014 application for WIS. STAT. § 230.36 benefits.
¶11 On November 18, 2014, Vander Galien submitted her second application for hazardous duty pay, attaching duty disability reports from two mental health professionals, Dr. Brad Grunert, a psychologist, and Dr. Victoria Passov, a psychiatrist. Both reports stated that Vander Galien suffered from post-traumatic stress disorder and a panic disorder resulting from the December 2011 injury and that these conditions prevented her from further work with inmates. Dr. Grunert stated that, due to the incident on December 16, 2011, Vander Galien's "work ability" had been "seriously compromised." Dr. Passov noted that Vander Galien would "not be able to work at a correctional facility because of her trauma."
¶12 DOC denied the request on the grounds that the claimed injury was a "[n]on physical injury" and the denial form contained the following notation: "Reached physical end of healing. Has PTSD due to incident in 2011."
¶13 Vander Galien then submitted an additional duty disability report, authored by a physiatrist, Dr. Douglas Hendricks, opining that the December 2011 injury probably directly caused her "significant right low back pain radiating to right hip and thigh" and resulted in permanent disability. Vander Galien later provided a second recommendation from Dr. Hendricks, dated December 19, 2014, stating that Vander Galien was recommended to have "[n]o exposure to situations where she would need to physically handle or take down an inmate or where she could be assaulted physically" and that these restrictions were in effect "permanently."
¶14 DOC began conducting job searches to find a new position for Vander Galien that would satisfy the permanent medical restrictions specified by her doctors. The search was unsuccessful and DOC medically separated her from employment on April 17, 2015.
WERC's decision.
¶15 Following DOC's denial of her WIS. STAT. § 230.36 claim, Vander Galien appealed to WERC.
¶16 In addition to the duty disability reports Vander Galien submitted, WERC considered four doctors' reports.
¶17 Dr. Xian Gu evaluated Vander Galien for neck pain in January 2012. In the record of that visit Dr. Gu noted that cervical spine x-rays showed "degenerative arthritis." The record also noted that Vander Galien's "past medical history" included anxiety disorder. An MRI ordered by Dr. Gu and performed by Dr. John Wolfe in January 2012 showed "[s]ignificant degenerative change" in the mid cervical spine.
¶18 Three additional reports were filed by doctors in connection with Vander Galien's worker's compensation claim. An April 19, 2012 report filed by Dr. Richard Sturm stated that the healing period had ended effective April 4, 2012, that she was discharged from treatment, and that she had no further work limitations.
¶19 On April 7, 2014, Dr. Nicholas Ketchum completed a review of Vander Galien's medical records. Dr. Ketchum concluded that "a healing plateau, as it relates to the work incident dated December 16, 2011, was reached on April 4, 2012, when [she] was released to full duty work." His diagnosis was that three conditions related or directly related to the injury-cervical spine muscular/ligamentous strain, right shoulder muscular/ligamentous injury, and a thigh muscular/ligamentous injury-had resolved. He further opined that based on the MRIs obtained on January 30, 2012, and December 19, 2012, "the diagnoses of lumbar spondylosis and continued complaints of low back pain are unrelated to the incident in question ... and are, instead, manifestations of pre-existing degenerative conditions" and that they "were not precipitated, aggravated and accelerated" by the incident. He stated that "the pre-existing conditions were longstanding and were not aggravated by the ... incident."
¶20 On April 3, 2015, a psychologist, Dr. Calvin Langmade, completed a review of Vander Galien's mental health records. Based in part on a lack of objective data verifying the severity of her symptoms and her "pattern of attending mental health treatment"-specifically the two-year gap in treatment between 2012 and 2014-he stated that he was "not convinced that there is any causal relationship to [her] occupation or any specific work event and her current diagnoses." He also concluded that based on her apparent ability to work from 2011 through 2014, there was no evidence that Vander Galien was incapable of performing her duties, and that no mental-health related restrictions were warranted.
¶21 In response to Vander Galien's argument that she was entitled to the benefit for the 271.25 hours because the injury was a cause of the appointments and absences from work, WERC found that DOC had properly denied the benefit for the 271.25 hours of absences from work because "[t]he medical appointments and absences were not directly related to the work injury[.]" It noted that medical reports showed "a variety of pre-existing conditions[.]" It cited Dr. Ketchum's opinion that the healing period for the December 2011 injury had ended as of April 2012 and that all the later medical treatment was "not directly related to the incident in question."
¶22 In response to Vander Galien's claim for WIS. STAT. § 230.36 pay for the period between November 2014 and April 2015 during which she claimed to be unable to work, WERC found that she was "physically able to perform the duties" of her job. It credited the evidence that Vander Galien was capable of performing her duties-specifically, a report by Dr. Langmade that noted "significant gaps of time between treatment sessions in 2012 that suggest an ability on her part to work and function between sessions that is inconsistent with" a severe psychological injury. The same report stated that it was "very peculiar" that Vander Galien saw her psychologist "for only one session on October 8, 2014, and then he opines that after only one session she is 8% disabled despite her past two years of working without apparent difficulties and no treatment sessions" (emphasis added). The report stated that the opinion that she was capable of performing her duties was based on "her past performance" and her ability to work "following the work incident in December 2011."
¶23 Accordingly, WERC declined to award benefits for any time following Vander Galien's return to work after the injury.
Trial court decision.
¶24 The trial court affirmed on WIS. STAT. ch. 227 judicial review, and Vander Galien now appeals.
DISCUSSION
I. Standard of review.
¶25 Statutes establish the hazardous duty pay benefit, the appellate procedure for denied claims, the right to judicial review, and the standard of review.
¶26 Vander Galien's eligibility for hazardous duty pay is governed by WIS. STAT. § 230.36(2m)(a) and (b), which provide that prison guards injured on the job "shall continue to be fully paid by the employing agency upon the same basis as paid prior to the injury, with no reduction in sick leave credits, compensatory time for overtime accumulations or vacation and no reduction in the rate of earning sick leave credit or vacation" and that "full pay ... shall continue while the employee is unable to return to work as the result of the injury or until the termination of his or her employment upon recommendation of the appointing authority." Her right to appeal the denial of that benefit to WERC is statutory. See WIS. STAT. §§ 230.36(4), 230.45(1)(d).
¶27 Vander Galien's right to judicial review of WERC's decision is likewise established under statute, see WIS. STAT. § 227.52(7), as is the scope of judicial review of agency decisions under Chapter 227: a court "shall affirm the agency's action" "[u]nless the court finds a ground for setting aside ... agency action ... under a specified provision of this section[.]" WIS. STAT. § 227.57(2). As relevant to this appeal, the specified provisions under which the court could find grounds for setting aside WERC's denial of hazardous duty pay are as follows:
The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.
...The court shall ... set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record .
Sec. 227.57(5) - (6) (emphasis added).
¶28 Kenosha Teachers Union Local 557 v. WERB , 39 Wis. 2d 196, 204, 158 N.W.2d 914 (1968), defines "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]"
¶29 "We are required to assume, unless there is affirmative proof to the contrary, that the commission acted regularly as to all matters and pursuant to the rules of law and proper procedures in its determination." Davis v. Industrial Comm'n , 22 Wis. 2d 674, 678-79, 126 N.W.2d 611 (1964) (quoting Brouwer Realty Co. v. Industrial Comm'n , 266 Wis. 73, 80, 62 N.W.2d 577 (1954) ).
¶30 As to an agency's legal conclusions, our supreme court has recently "decided to end [the] practice of deferring to administrative agencies' conclusions of law." Tetra Tech EC , Inc. v. DOR , 2018 WI 75, ¶ 108, 382 Wis. 2d 496, 914 N.W.2d 21. Our supreme court stated that an administrative agency's conclusions of law are to be reviewed "under the same standard we apply to a [trial] court's conclusions of law-de novo ." Id. , ¶ 84. The court stated that, pursuant to WIS. STAT. § 227.57(10), a court is to "give 'due weight' to the experience, technical competence, and specialized knowledge of an administrative agency" as it considers the agency's arguments. Id. , ¶ 108.
II. Substantial evidence in the record supports the factual findings on which WERC based its conclusion that Vander Galien was ineligible for post-return-to-work hazardous duty pay benefits.
¶31 Vander Galien makes three points related to the lack of substantial evidence in the record to support the factual findings.
¶32 First, Vander Galien argues that there is "affirmative proof" that WERC did not consider all of the evidence when it found that the medical appointments and absences were not related to the injury. Specifically, she argues that WERC overlooked evidence from her physiatrist, Dr. Hendricks, as to her physical condition, and that this oversight led to a "fatal misunderstanding" of her claim. She bases her argument on the fact that WERC misstates Dr. Hendricks' title and refers to him as a "psychiatrist" rather than a "physiatrist." She notes that WERC stated in its memorandum that there was "no evidence that the medical treatment was directly related" to the injury, and she argues that this statement shows that WERC was unaware of Dr. Hendricks' report about her physical conditions. Because Dr. Hendricks' report was not considered, she argues, WERC's decision "could not have been based on substantial evidence in the record as a whole[.]" We are not persuaded.
¶33 WERC considered Dr. Hendricks' treatment of Vander Galien's physical conditions because that treatment is explicitly referred to in Dr. Ketchum's report, and WERC relied on Dr. Ketchum's report. Dr. Ketchum's report extensively detailed at least seventeen of Vander Galien's visits to Dr. Hendricks for physical pain between August 2012 and January 2014. Dr. Ketchum described the physical treatments Vander Galien received from Dr. Hendricks. WERC made explicit note of how the independent medical evaluation performed by Dr. Ketchum supported its decision: "Our conclusion is further supported by the independent medical examination performed by Dr. Nicholas Ketchum. He concluded that all of the post April 4, 2012 medical treatment was 'not directly related to the incident in question.' " WERC's reliance on a report that itself detailed Dr. Hendricks' treatment actually constitutes affirmative proof that the agency acted "pursuant to the rules of law" in considering all the evidence, including the evidence that Dr. Hendricks treated Vander Galien for physical injury. See Davis , 22 Wis. 2d at 678-79 (we assume agency acted pursuant to the rules of law absent "affirmative proof to the contrary ").
¶34 Second, Vander Galien attacks Dr. Langmade's report as failing to constitute "substantial evidence" for the finding that she was capable of working after November 2014. She argues that Dr. Langmade needed more information than he had available to him in order to produce a reliable report, specifically that he made no personal evaluation and that he did not have the records of her treating psychiatrist or her records of physical treatment. She argues that these deficiencies rendered his opinion so flawed that it can not be considered "substantial evidence."
¶35 Dr. Langmade reviewed ample medical information-session notes from Vander Galien's treatment with Dr. Grunert, the duty disability medical reports by Dr. Grunert and Dr. Passov, and Dr. Sturm's report from April 19, 2012, stating that Vander Galien's physical injury had healed. Dr. Langmade could have had more information, but the evidence he had was substantial. It supported WERC's factual finding.
¶36 Third, Vander Galien argues that WERC's finding as to her ability to work after November 2014 is based on the factually incorrect premise that Vander Galien "provided false information to her treatment providers" that she was assaulted by an inmate. She argues that it is "immaterial whether she was objectively correct" in her perception that the incident was an assault.
¶37 WERC did note that the evidence supporting Vander Galien's assertion about her inability to work was from doctors who "rendered their opinions based upon incorrect factual information." WERC pointed out that the record reflected a discrepancy between objective evidence of the incident and Vander Galien's perceptions and reports of it. The interviews with witnesses and Vander Galien's own contemporaneous reports told a consistent story: that an inmate had collided with Vander Galien. In contrast, Vander Galien later characterized the incident to her doctors as violent, and their adoption of her characterization resulted in reports containing terms such as "body slam," "attack," "assault," and "violent[ ] assault." WERC also noted that one of her doctors reported that Vander Galien had been "assaulted by an inmate and no one came to her aid"-an assertion that has no basis whatsoever and is contradicted by Vander Galien's own account.
¶38 WERC's observations are consistent with the evidence in the record. The observations were made in connection with its weighing of the evidence, and they went to the credibility of the doctors who were opining about Vander Galien's ability to perform the duties of her job after November 2014. The doctors had clearly been provided evidence that was inconsistent with the evidence provided by multiple witnesses, and therefore their opinions were given less weight. It may be of no relevance what Vander Galien thought of the incident, but it was relevant for WERC to consider whether Vander Galien's experts had a factual basis for their opinions that was supported by the record. They did not. Therefore, WERC's factual finding about Vander Galien's ability to perform the duties of her job is supported by substantial evidence.
¶39 The memorandum accompanying WERC's decision and order spells out the evidence in support of the finding concerning Vander Galien's 271.25 hours of sick leave. It noted that the evidence in the record of the purposes of those absences was "scant" as a general matter, and that evidence was specifically lacking that the absences were "directly related" to the 2011 injury. The record includes an affidavit from DOC and a chart showing Vander Galien's absences between April 4, 2012 and November 12, 2014, along with the reasons she provided at the time of the absence. The notations include seven days of absences due to "low back pain," but also include absences for sick family members, dentist appointments, and twelve absences for which no reason was provided. WERC further noted the medical reports and MRIs that indicated "a variety of pre-existing conditions" relevant to back and neck pain.
¶40 The memorandum also details the problems with the doctor's duty disability reports submitted in support of Vander Galien's claim for the five months of hazardous duty pay beginning November 2014. It clearly describes a credibility problem with that evidence, and contrasts that with the "accurate[ ] evaluat[ion]" by Dr. Langmade, which cited the undisputed fact that Vander Galien had been capable of working without treatment for two years.
¶41 All of this evidence-the unrelated absences between April 2012 and November 2014, the report of pre-existing conditions, the inaccurate factual background given to her doctors, and Vander Galien's ability to perform the duties of her job for two years-shows support for WERC's decision that Vander Galien was ineligible for hazardous duty pay for any of the post-return-to-work absences. We conclude that substantial evidence supports the factual findings. We therefore conclude that Vander Galien failed to show WERC's decision was not reasonably based on the evidence in the record.
III. WERC applied the correct standard, which is whether the compensable injury was "a cause" of the later missed work.
¶42 Vander Galien also argues that WERC erred by "plac[ing] a burden on Vander Galien to prove that the work incident was the direct and only cause of her spine disability, contrary to prior interpretation of law." She argues that she needs to show only that the work injury was a cause-not the cause-of a subsequent impairment.
¶43 She argues that the correct standard is derived from Palmeri v. DOC , Case No. 90-0007-PC (Pers. Comm'n, October 4, 1990), in which the Personnel Commission[3] relied on cases interpreting worker's compensation law when it was determining the scope of compensable injuries under the hazardous duty pay statute. The Personnel Commission interpreted the hazardous duty pay statute to cover a subsequent, otherwise noncompensable injury-even if the worker had returned to work after the compensable injury-so long as the employee alleged and then proved "a connection between" a later disability and an earlier "injury that concededly was covered." Id. at 5. Vander Galien argues that this means that the December 2011 injury-"even if it is only a cause of the employee's disability, in combination with other, non-industrial factors such as a pre-existing condition"-entitled her to the hazardous duty pay she sought.
¶44 Applying the "a cause" standard, we conclude that Vander Galien has failed to meet it. We agree with the State that Vander Galien did not show that the December 2011 injury was "a cause" of her later disability. Even though WERC stated its finding using the phrase "directly related," the evidence on which it based its finding correctly addressed whether the injury was a cause of the later disability. Dr. Ketchum's and Dr. Langmade's opinions were that the injury was not "a cause" of the later disability. Dr. Ketchum's opinion was that Vander Galien's diagnoses "were not precipitated, aggravated and accelerated beyond normal progression [by the December 2011 incident]" and that "no permanent partial disability was sustained as a result of the incident" (emphasis added). Dr. Langmade opined that he was "not convinced that there is any causal relationship" between Vander Galien's "occupation or any specific work event and her current diagnoses."
¶45 Because substantial evidence supports the findings of fact, and because the findings of fact are dispositive, we affirm the agency's decision.
By the Court. -Order affirmed.
Not recommended for publication in the official reports.

Under the relevant provisions of the hazardous duty pay statute, Wis. Stat. §§ 230.36(1m)(b) 3.c. and 230.36(2m)(a) and (b) (2015-16), a prison guard who misses work due to an injury "occasioned as the result of an act by a[n] ... inmate" is entitled to receive full pay for any missed work without using sick leave credits, compensatory time, or vacation days.
All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

On April 17, 2015, DOC "medically separated" Vander Galien from her employment.

The Wisconsin Personnel Commission is WERC's predecessor agency.